## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH LEVATO, an individual, and ANGELA LEVATO, an individual, | ) ) ) | |
| | ) | No. 20 C 1999 |
| Plaintiffs, | ) ) | |
| | ) | Magistrate Judge |
| v. | ) ) | Maria Valdez |
| MARY A. O'CONNOR, individually and as Trustee for the Mary A. O'Connor Trust dated March 23, 2000; MARY A. O'CONNOR TRUST dated March 23, 2000; GALE G. ACKER, individually and as Trustee for the Gale G. Acker Trust dated March 23, 2000; and GALE G. ACKER TRUST dated March 23, 2000, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs Joseph Levato and Angela Levato brought this action against

Defendants Mary O'Connor and Gale Acker alleging that Defendants failed to

disclose certain defects in a home Defendants sold to Plaintiffs. The parties have

consented to the jurisdiction of the United States Magistrate Judge pursuant to 28

U.S.C. § 636(c). This Court conducted a bench trial from January 23, 2023 to

January 25, 2023. The matter is now before the Court for findings of fact and

conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

In rendering this decision, the Court has considered the testimony of the witnesses who testified at trial, the parties' admitted trial exhibits, the stipulations made by the parties, the parties' proposed findings of fact and conclusions of law, and the briefs of counsel. To the extent certain findings of fact may be deemed conclusions of law, they should also be considered conclusions of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they should also be considered findings of fact.

## FINDINGS OF FACT

1. Plaintiffs Joseph Levato and Angela Levato are residents of Prospects Heights, Illinois.

2. Defendant Mary O'Connor is a resident of Queen Creek, Arizona.

3. Defendant Gale Acker is a resident of Show Low, Arizona.

4. In the early-to-mid 1990s, O'Connor and Acker acquired the property located at 111 East Clarendon Street in Prospects Heights, Illinois (the "Property").

5. In 2004, Defendants tore down a pre-existing house at the Property and built a new house.

6. The main floor of the house has a kitchen, breakfast room, dining room, three bedrooms, and three bathrooms.

7. The basement level of the house is finished and has an entertaining area, wet bar, wine cellar, second family room, second kitchen, bedroom, full bathroom, powder room, and workshop.

8. As of 2008, the basement at the Property was experiencing water seepage,

and Defendants hired Basement Flood Protector to install an interior drain tile system.

9.      A drain tile system is subsurface piping installed beneath a basement floor to capture water.

10.     A drain tile system directs water into a pit or subbasin, and the water is then moved out of the home by a sump pump.

11.     Even after they had the drain tile system installed, Defendants continued to experience water seepage in the basement.

12.     The Property has an iron bacteria condition.

13.     The basement of the Property would experience water seepage because drain tile lines at the Property would get clogged by the iron bacteria.

14.     Iron bacteria is a microbe that multiplies and creates an orange, rust-colored sludge that clogs up drain tiles and sump pumps.

15.     Iron bacteria is an uncommon property condition.

16.     Iron bacteria cannot be permanently eliminated from a drain tile system.

17.     The iron bacteria condition at the Property cannot be permanently eliminated.

18.     The iron bacteria condition at the Property will always necessitate ongoing maintenance.

19.     The color of the flooring in the basement is in an orangish rust color that is similar to the color of iron bacteria.

20.     Over the years, Defendants periodically had the drain tile system hydrojetted

to address the water seepage and iron bacteria condition.

21.　Hydrojetting is the process of using high-pressure water to clear debris, clogs, and build-up in pipes and plumbing.

22.　If the drain tile pipes at the Property were not hydrojetted, they would clog and water seepage would result.

23.　Given that iron bacteria cannot be eliminated, iron bacteria will continue to regrow and reoccur even after hydrojetting.

24.　Even with periodic hydrojetting, Defendants continued to experience water seepage in the basement.

25.　As of 2017, the drain tile system at the Property was severely clogged due to the recurring buildup of iron bacteria.

26.　In 2017, John Sloss of Basement Flood Protector recommended to Defendants that they install clean-out access ports in the drain tile system to add chlorine on a periodic basis to mitigate the growth of the iron bacteria, but Defendants did not have that work performed.

27.　In the summer of 2018, Defendants were anticipating selling the Property.

28.　In July 2018, Defendants showed the Property to real estate broker Lori Moses.

29.　Defendants informed Moses that they had an existing water seepage issue in the basement.

30.　Defendants did not advise Moses about the iron bacteria condition at the Property.

4

31.     Moses e-mailed Defendants on August 2, 2018 and stated that for the "water issue in basement," Defendants "[n]eed to get that resolved" as it was "a 'show stopper' for buyers."

32.     In August 2018, Moses recommended three waterproofing companies to Defendants: Alliance Restoration, PermaSeal, and U.S. Waterproofing.

33.     On August 22, 2018, Chris Nielsen of U.S. Waterproofing visited the Property and spoke with Defendants.

34.     Defendants informed Nielsen that they had a water seepage problem and that water would run across the floor in the southwest corner of the basement after a big rainstorm.

35.     At the time of Nielsen's visit, there was water on the floor of the basement, which appeared to have been caused by a backup of the drain tile system due to the presence of iron bacteria.

36.     Nielsen found indications of iron bacteria in the existing drain tile system, including orange sludge in the drain tile, orange residue in the sump pump, and orange water at the discharge termination point for the sump pump and the storm basin.

37.     Nielsen gave Defendants an initial verbal quote of $11,016 for a specialized iron bacteria drain tile system.

38.     Installing the proposed specialized iron bacteria drain tile system would involve removing drywall and jackhammering the floor of the basement to put in the subsurface piping.

39.     On August 24, 2018, Nielsen called O'Connor and advised her that a more expensive, full perimeter drain tile system would be necessary because the originally proposed work would not have solved the water seepage problems.

40.     Defendants did not have U.S. Waterproofing perform any work.

41.     On February 19, 2019, John Sloss of Basement Flood Protector gave Defendants a quote of $3,200 to install cleanout access ports in the drain tile system and to cut a two-inch wide channel from the wall near the ejector pit to the flood drain.

42.     On February 23, 2019, Defendants e-mailed Moses and informed her that "[w]e are still working on a solution to the basement seepage and should be close to a resolution on that."

43.     In the spring of 2019, Defendants paid $1,300 to Basement Flood Protector to cut a channel in the floor to redirect water seepage.

44.     Defendants did not believe having the channel cut in the floor fully corrected the iron bacteria condition or water seepage issues.

45.     On March 15, 2019, Defendants informed Moses that they planned to list the Property for sale with Moses as their broker.

46.     On April 18, 2019, four months after the previous hydrojetting and nine days before the Property was listed for sale, Defendants had the drain tile system hydrojetted.

47.     On April 25, 2019, Keith Bradley of Keith Bradly Plumbing provided Defendants with a written estimate to install 10 feet of new drain tile piping for

6

$1,000 to address the iron bacteria condition, but Defendants did not have that work performed.

48.     Defendants listed the Property for sale on April 27, 2019.

49.     In the years leading up to 2019, Plaintiffs were looking to purchase a new home because their children were getting older and moving out.

50.     Plaintiffs aimed to purchase a home that did not require significant maintenance.

51.     Plaintiffs saw the listing for the Property the day it was listed, and they toured the Property that same day.

52.     On April 28, 2019, Plaintiffs made a full-price offer of $650,000 to purchase the Property.

53.     At the time Plaintiffs made an offer on the Property, they requested an Illinois Residential Real Property Disclosure Report (the "Disclosure Report").

54.     Defendants completed and signed the Disclosure Report on April 28, 2019.

55.     Defendants knew and expected that potential buyers would read and rely on the statements made in the Disclosure Report.

56.     In the Disclosure Report, Defendants indicated that they were not aware of recurring leakage problems in the basement, that they were not aware of material defects in the plumbing system (including the sump pump), and that they were not aware of material defects in the air conditioning system at the Property.

57.     At the time they executed the Disclosure Report, Defendants knew there was still an iron bacteria problem at the Property, and that if the drain tile system was

not hydrojetted, the pipes would clog and there would be water seepage in the basement.

58. Plaintiffs reviewed the Disclosure Report and relied on Defendants' representations in moving forward with the purchase of the Property.

59. Defendants and Plaintiffs entered into a contract for the sale and purchase of the Property for the price of $650,000.

60. On May 2, 2019, Plaintiffs had the Property inspected by a licensed property inspector.

61. Plaintiffs' property inspection did not uncover the iron bacteria condition or water seepage problems.

62. Plaintiffs were concerned about water intrusion in particular because they wanted to utilize the finished basement at the Property and wanted a home that did not have significant maintenance issues.

63. On May 5, 2019, Plaintiffs' real estate attorney requested that Defendants "provide the details of any past instances of water intrusion or water leakage either inside or outside of the property, including the nature of the occurrence and how it was resolved since the sellers' ownership."

64. Mary O'Connor worked with Lori Moses to draft a response to Plaintiffs' attorney's query concerning water intrusion.

65. O'Connor's draft response stated as follows:

> Prospects Heights has high water tables. For a few years after sellers built the house they had a little water seepage on the west side of the lower level living area. The little bit of seepage that came in drained into the floor drain that's connected to the sanitary sewer. The water seepage

only occurred during very heavy rains. Sellers installed interior and exterior French drains, and routed the gutter downspouts underground. This corrected the water seepage. They have never experienced any flooding.

66. The final version of Defendants' response letter sent on May 7, 2019 stated as follows:

> For a few years after sellers built the house they had a little water seepage on the west side of the lower level living area. The little bit of seepage that came in drained into the floor drain that's connected to the sanitary sewer. The water seepage only occurred during [a] period when the ground was saturated and there were excessive rains. A heavy rain alone did not cause seepage. Sellers installed interior and exterior French drains, and routed the gutter spouts underground. This corrected the water seepage. They never experienced any flooding.

67. Plaintiffs relied on the response letter in moving forward with the purchase of the Property and interpreted the letter to mean that there had been water seepage problems soon after the house was built but that the water seepage problems had been fixed.

68. In actuality, installation of French drains and routing the gutter spouts underground had not corrected the water seepage problems at the Property.

69. On May 24, 2019, Plaintiffs had Excel Plumbing inspect the sewer line in the backyard, along with the sump pump in the basement.

70. The plumbing inspector was permitted to inspect the basement of the Property and was not impeded during his inspection.

71. The plumbing inspector recommended that hydrojetting be performed on the sewer line to clean out sand and mud.

72. Plaintiffs' plumbing inspector did not discover the presence of iron bacteria at the Property.

73.     On May 26, 2019, Plaintiffs did a walkthrough of the Property with Defendants for the purpose of Defendants showing Plaintiffs the systems at the home.

74.     At the walkthrough, Joseph Levato specifically asked Mary O'Connor about any required maintenance or upkeep of the Property.

75.     Defendants explained certain systems and told Plaintiffs about certain maintenance items, and they provided Plaintiffs with business cards and contact information for service providers they had used in the past.

76.     Defendants did not tell Plaintiffs about the iron bacteria condition or that the drain tile system needed to be hydrojetted.

77.     Defendants did not provide Plaintiffs with any business cards for service providers that had serviced the drain tile system.

78.     O'Connor testified that Defendants should have told Plaintiffs that the drain tile system needed to be hydrojetted.

79.     The parties closed on the sale of the Property on May 30, 2019.

80.     Defendants received proceeds of $332,834.22 from the sale of the Property to Plaintiffs.

81.     During their final walkthrough of the Property, Plaintiffs noticed an issue with the radiant heat in the basement bedroom.

82.     On May 30, 2019, the parties closed on the sale of the Property and Plaintiffs paid Defendants the $650,000 purchase price.

83.     At closing, Defendants and Plaintiffs entered into an escrow agreement to set

aside $5,000 to make sure the radiant heat was working.

84.     After closing, Plaintiffs contended that the radiant heat was not working.

85.     In exchange for $2,758 from the escrow, Joseph Levato signed a release on July 9, 2019 which stated that he would "indemnify, hold harmless and release from liability" Defendants "for any issues stemming from or arising out of [the] purchase of [the Property], including but not limited to the radiant heat in the basement bedroom"

86.     After purchasing the Property, Plaintiffs were not aware that they needed to have the drain tile system hydrojetted.

87.     In late November 2019, Plaintiffs discovered water seepage in the basement with water coming up through the cracks and puddling on the floor.

88.     Joseph Levato then reached out to various waterproofing contractors, including U.S. Waterproofing.

89.     Chris Nielsen of U.S. Waterproofing visited the Property on December 10, 2019, and during his visit he found the same water seepage problem he had encountered at the Property during his visit in August 2018.

90.     John Sloss of Basement Flood Protector visited the Property and discovered that the iron bacteria condition had gotten worse, and he recommended that Plaintiffs put in a new drain tile system and ports.

91.     Plaintiffs have not had U.S. Waterproofing or Basement Flood Protector install a new drain tile system.

92.     Every couple of weeks, Joseph Levato adds chlorine tablets into the system

and flushes it out, a method of addressing iron bacteria he learned on the internet.

93.     Since November 2019, Plaintiffs have experienced multiple instances of water intrusion in the basement of the Property, including in the kitchenette area, workshop, and basement bedroom.

94.     On December 12, 2019, Plaintiffs were provided a U.S. Waterproofing estimate for $64,323 for a full perimeter double drain tile system.

95.     Even if a full perimeter double drain tile system was installed, the Property will always require ongoing maintenance to address the iron bacteria condition and water seepage.

96.     The cost to prepare the Property for installation of a new drain tile system and to restore the basement after installation of a new drain tile system would total $46,500.

97.     Plaintiffs' expert opined that the value of the property as of May 30, 2019 would be at or near $650,000 if the Property did not have the iron bacteria condition and water seepage problems, but that the value of the Property as of that date would not have exceeded $450,000 because of the iron bacteria condition and necessary repairs.

98.     After Plaintiffs purchased the Property, they began to notice dripping water from the two intake vents and stains on the hallway ceiling of the main floor, and the stains got worse as time went on.

99.     The property is equipped with a Spacepak high-velocity air conditioning system.

100. In February 2020, Brian Pasch of American Vintage Home inspected the air conditioning system at the Property, at which time he discovered water, rust, and mold, along with six ultraviolet lights installed in the air conditioning system.

101. It was determined that the air conditioning system required replacement.

102. In May 2020, Plaintiffs paid $54,000 to replace the air conditioning system at the Property.

## CONCLUSIONS OF LAW

### I. THE RELEASE DOES NOT BAR PLAINTIFFS' CLAIMS

Defendants argue that Plaintiffs waived their claims in this case through the release Joseph Levato signed on July 9, 2019. Under Illinois law, a release "is a contract wherein a party relinquishes a claim to a person against whom the claim exists, and a release is subject to the rules governing the construction of contracts." *Carona v. Ill. Cent. Gulf. R. Co.*, 561 N.E.2d 239, 242 (Ill. App. Ct. 1990) (citation omitted). "The scope and effect of [a] release are controlled by the intention of the parties, and this intent is determined not only from the express language of the release but also from the circumstances surrounding its execution." *Constr. Sys., Inc. v. FagelHaber, LLC*, 35 N.E.3d 1244, 1252 (Ill. App. Ct. 2015) (citation omitted). "[N]o form of words, no matter how all encompassing, will foreclose scrutiny of a release or prevent a reviewing court from inquiring into surrounding circumstances to ascertain whether it was fairly made and accurately reflected the intention of the parties." *Carlile v. Snap-on Tools*, 648 N.E.2d 317, 321 (Ill. App. Ct. 1995) (citations

omitted). Releases are to be "strictly construed against the benefitting party." *FagelHaber*, 35 N.E.3d at 1251-52 (citations omitted).

Pursuant to Illinois law, a release "cannot be construed to include claims not within the contemplation of the parties." *Carlile*, 648 N.E.2d at 321 (citations omitted). Further, "knowledge by one party, where the other party lacks knowledge, does not bring the claim within the contemplation of the parties." *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 763 (Ill. App. Ct. 2003) (citation and internal quotations omitted). Correspondingly – as a general matter – "general words of release are inapplicable to claims that were unknown to the releasing party." *FagelHaber*, 35 N.E.3d at 1252 (citation omitted). And, crucially, "[w]here the releasing party was unaware of other claims, Illinois case law has restricted general releases to the specific claims contained in the release agreement." *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991).

Under this legal framework, the Court finds that Plaintiffs did not release the claims they have asserted in this action. The release stated in full as follows:

> I, Joseph Levato, in exchange for payment in the amount of $2,758.00 (two thousand, seven hundred and fifty-eight dollars), receipt of which is hereby acknowledged, hereby indemnify, hold harmless and release from liability Mary O'Connor and Gale Acker for any issues stemming from or arising out of our purchase of 111 E. Clarendon Street, Prospects Heights, including but not limited to the radiant heat in the basement bedroom, and further authorize the escrowee, Jacobs and Rosenzweig, to release $2,242.00, the remainder of the escrowed funds, to sellers Mary O'Connor and Gale Acker, without further delay. This agreement is binding upon and inures to the benefit of the parties, their spouses, and their respective permitted successors and assigns.

(JX 25.)

Looking at the circumstances surrounding the release, it is apparent that execution of the release arose solely because Plaintiffs identified issues with the radiant heat in the basement bedroom. The release contains general words of release – "any issues stemming from or arising out of [Plaintiffs'] purchase of [the Property]" – but specific claims are also recited – "including but not limited to the radiant heat in the basement bedroom." Crucially, at the time the release was executed, Plaintiffs were not aware of any claims they may have arising out of the iron bacteria condition and/or water seepage problems at the Property, because Defendants had not disclosed that those defects existed. Given Plaintiffs' unawareness in that regard, the release in this case must be limited to the specific claims identified, *i.e.*, claims related to the radiant heat in the basement. *See Whitlock*, 581 N.E.2d at 667; *Carlile*, 648 N.E.2d at 321 ("Where there are words of general release in addition to recitals of specific claims, the words of general release are limited to the particular claim to which reference is made."); *Carona*, 561 N.E.2d at 242 ("Here, the release signed by the parties contained words of general release; however, the release also specifically referred to the incident of July 29, 1983. Under the law, this specific language reflects that the parties intended to release only those actions which would arise in the future from the July 1983 accident."). Defendants cannot seriously contend that, based on their unilateral intention, the release should apply to claims concerning defects Defendants had represented did not exist. *See Carlile v. Snap-on Tools*, 648 N.E.2d 317, 322 (Ill. App. Ct. 1995) ("Even where the parties intend to release a specific claim, the

release of that claim will not be enforced if there has been fraud, duress, mutual mistake, or, at least in some cases, unconscionability.") (citations omitted).

In arguing that the release should apply to Plaintiffs' claims in this case, Defendants rely on *Goodman v. Hanson*, 945 N.E.2d 1255 (Ill. App. Ct. 2011). However, the *Goodman* court held that an unknown claim was released based on its finding that the claim "falls within the specific language of the release." *Id.* at 1268. Similarly, in *Gavery v. McMahon & Elliott*, 670 N.E.2d 822 (Ill. App. Ct. 1996), also relied on by Defendants, the court determined that the claims at issue fell under the "very specific and unambiguous" language of the release. *Id.* at 825. These decisions are inapposite because, in this case, Plaintiffs' claims do not fall within the specific language of the release, which relates only to radiant heating in the context of the home purchase. *See Motorola Sols., Inc. v. Zurich Ins. Co.*, 33 N.E.3d 917, 947 (Ill. App. Ct. 2015) ("*Goodman* is inapposite to the instant case. As noted, in that case, there was no question that the claims asserted fell within the terms of the release."). Ultimately, the Court concludes that the release does not bar the claims Plaintiffs have asserted in this matter.

## II.    PLAINTIFFS ARE ENTITLED TO EQUITABLE RELIEF

Count I of Plaintiffs' Amended Complaint seeks rescission of the real estate contract between the parties. Rescission is an equitable remedy. *23-25 Bldg. P'ship v. Testa Produce, Inc.*, 886 N.E.2d 1156, 1163 (Ill. App. Ct. 2008). "It has been long established that a court will not grant equitable relief if the plaintiff has an adequate remedy at law." *Benton v. Little League Baseball, Inc.*, 181 N.E.3d 902,

919-20 (Ill. App. Ct. 2020). Accordingly, "[a]s with other equitable remedies, a court will not grant rescission if the plaintiff has an adequate remedy at law." *Horwitz v. Sonnenschein Nath & Rosenthal*, 126 N.E.3d 1, 7-8 (Ill. App. Ct. 2018).  If a party's injury "can be adequately compensated through money damages, it has an adequate remedy at law." *CC Disposal, Inc. v. Veolia ES Valley View Landfill, Inc.*, 952 N.E.2d 14, 19 (Ill. App. Ct. 2010) (citation omitted). The question of "whether a legal remedy is 'adequate' entails two discrete inquiries." *Horwitz*, 126 N.E.3d at 8. "First and foremost, the court must consider whether the legal remedy is capable of making the plaintiff 'whole.'" *Id.* (citations omitted). "The second requirement is that the legal remedy must be 'clear, complete, and as practical and efficient to the ends of justice and its prompt administration as the equitable remedy.'" *Id.* (citations omitted). Courts take a "practical view of the circumstances in determining whether the legal remedy could make the plaintiff whole." *Id.*

In this case, Plaintiffs have sought monetary damages in the alternative to their request for rescission, as they are entitled to do. *See* Fed. R. Civ. P. 8(a); *Goldberg v. 401 N. Wabash Venture LLC*, No. 09 C 6455, 2013 WL 941964, at *5 (N.D. Ill. Mar. 11, 2013) ("Asserting rescission as *one* of the remedies [plaintiff] seeks does not preclude her from alternatively seeking affirmance of the Purchase Agreement and related damages."). However, the Court finds that money damages would not make Plaintiffs whole nor be as clear, complete, and practical and efficient to the ends of justice as an equitable remedy. *See Tierney v. Vill. Of Schaumburg*, 538 N.E.2d 904, 908 (Ill. App. Ct. 1989) ("In the present case,

17

although plaintiffs' remedy at law in the form of monetary damages might be clear, such a remedy would not be complete nor as practical and efficient to the ends of justice and its prompt administration as the equitable relief that is sought."). Ultimately, monetary damages cannot fully compensate Plaintiffs for being saddled with home that will forever require costly ongoing maintenance due to an incurable iron bacteria condition and intractable water seepage problems. Accordingly, Plaintiffs are entitled to equitable relief.

## III.  PLAINTIFFS ARE ENTITLED TO RESCISSION

As stated above, Count I of Plaintiffs' Amended Complaint seeks rescission of the real estate contract between the parties. Rescission is "the cancelling of a contract so as to restore the parties to their initial status." *Kai v. Bd. Of Directors of Spring Hill Bldg. 1 Condo Ass'n, Inc.*, 171 N.E.3d 42, 54 (Ill. App. Ct. 2020) (citation omitted). Put differently, "[r]escission of a contract refers to cancellation of that contract, so as to restore the parties to the status quo *ante*, the status before they entered into the contract." *Hassan v. Yusuf*, 944 N.E.2d 895, 917-18 (Ill. App. Ct. 2011) (citation omitted). Rescission "is an equitable remedy, the application of which is left largely to the discretion of the trial court." *Id.* at 918 (citation omitted). Rescission is available "where there has been some fraud in the making of a contract, such as an untrue statement or the concealment of a material fact, or where one party enters into a contract reasonably relying on the other party's innocent misrepresentation of a material fact." *Kai*, 171 N.E.3d at 54 (citation omitted). To establish a "claim for rescission on the basis of fraud and

misrepresentation, [a plaintiff] must prove: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) intended to induce the other party to act; (4) acted on by the other party in reliance on the truth of the representation; and (5) resulting damages." *23-25 Bldg. P'ship v. Testa Produce, Inc.*, 886 N.E.2d 1156, 1164 (Ill. App. Ct. 2008) (citation omitted). In the context of rescission, a misrepresentation is "material" if "the recipient would have acted differently had he been aware of the falsity of the statement, or if the person making it knew the statement was likely to induce the recipient to engage in the conduct in question." *Id.* (citation omitted). A misrepresentation is also "material" if the representation "concerned the type of information upon which [the party seeking rescission] would be expected to rely when making his decision to act." *Jordan v. Knafel*, 880 N.E.2d 1061, 1069 (Ill. App. Ct. 2007) (citation omitted). To be material, "the representation need not have been the paramount or decisive inducement, so long as it was a substantial factor." *Id.* (citation and internal quotations omitted).

In this case, the Court concludes that Defendants made multiple false statements. Namely, Defendants represented in their April 28, 2019 Disclosure Report[1] that they were not aware of recurring leakage problems in the basement and were not aware of material defects in the plumbing system, including the sump pump. Further, Defendants represented in their May 7, 2019 response letter that

---

[1] Notably, "[a] fraudulent misrepresentation claim may be based solely on a disclosure made pursuant to the [Illinois Residential Real Property Disclosure] Act." *Bauer v. Giannis*, 834 N.E.2d 952, 960 (Ill. App. Ct. 2005).

the installation of French drains had corrected any water seepage. All of these statements were undeniably false, and were known to be false by Defendants. As to the representations made in Defendants' response letter, it is undisputed – and in fact stipulated – that "[e]ven after the installation of the drain tile system" in or around 2008, Defendants "continued to have water seepage in the basement." (Stip. Facts ¶ 9.) As to the representations made in Defendants' Disclosure Report, it is undisputed – and in fact stipulated – that as of August 2018 iron bacteria was present in the sump pump. (*Id.* at ¶¶ 22-24.) Further, it is undisputed – and in fact stipulated – that as of July 2018 Defendants "had an existing water seepage issue in the basement." (*Id.* at ¶¶ 17-18.) Additionally, it is undisputed – and in fact stipulated – that as of August 2018 Defendants "had a water seepage problem and . . . water would run across the floor in the southwest corner of the basement after a big rainstorm." (*Id.* at ¶¶ 22-23.)[2]

The Court finds that in making the aforementioned misrepresentations, Defendants intended to induce Plaintiffs to act, specifically, to go forward with the purchase of the Property; an action Plaintiffs completed in reasonable reliance on Defendants' representations. The Court further concludes that Defendants' misrepresentations were material. Information concerning an uncommon iron bacteria condition (that continuously creates an orange, rust-colored sludge that clogs up drain tiles and sump pumps) and recurring water seepage problems in a

---

[2] Although Defendants paid to have a channel cut in the basement floor in April 2019, the Court has determined that Defendants did not believe that work fully corrected the iron bacteria condition or water seepage issues.

finished basement is plainly the type of information upon which a home purchaser is expected to rely. Further, Plaintiffs would have acted differently if they had been aware of the falsity of Defendants' statements. Based on the trial testimony and record, the Court finds that, quite simply, Plaintiffs would not have purchased the Property if they had been told about the iron bacteria condition and recurring water seepage problems. Accordingly, the Court concludes, in its discretion, that Plaintiffs are entitled to rescission of the real estate contract.[3]

In so holding, the Court finds instructive the decision in *Cotter v. Parrish*, 520 N.E.2d 1172 (Ill. App. Ct. 1988). In *Cotter*, the defendants built an underground house which was subsequently purchased by the plaintiffs "[a]fter several visits and one meeting with the [defendant] to discuss any problems such as cracks or leaks in the structure." *Id.* at 1173. At the time the plaintiffs purchased the property, the defendant "assured them the house had no problems, cracks or leaks." *Id.* After moving into the house, the plaintiffs discovered many problems, including "that the atrium leaked constantly during rains, the exhaust fan above the stove dripped water, and the tunnel from the residence to the detached garage/barn often contained water." *Id.* at 1174. The plaintiffs also "discovered leaks in the closets of the master and second bedrooms, the northwestern corner of the living room and the master bedroom bathroom." *Id.*

---

[3] The Court has determined that Plaintiffs are entitled to rescission based on Defendants' misrepresentations concerning the iron bacteria condition and water seepage problems. As it is unnecessary to the Court's determination in that regard, the Court does not pass on the question of whether Defendants also made false representations or concealed material facts concerning the air conditioning system at the Property.

The *Cotter* court affirmed the trial court which had "grant[ed] rescission of the [purchase] contract on the basis of material misrepresentations in the inducement." *Id.* at 1175. In so holding, the appellate court reasoned as follows:

> Despite inquiry by plaintiffs, the [defendants] failed to disclose known structural defects in the underground dwelling. They did not inform plaintiffs of water leakage in the atrium or above the stove; nor did they reveal that the exhaust fan vent line had been capped. Instead, they told the plaintiffs that there were no leaks and that the fan vented to the outside. [The defendants] also represented that waterproofing had been applied to the exterior walls when, in fact, damp-proofing material had been used. Lastly, the [defendants] actively concealed the only visible defects by placing a trailer in front of it. . . . The [defendants] cannot claim as a defense that plaintiffs were not sufficiently careful to discover their fraud. The [defendants'] misrepresentations and intentional nondisclosure of material information went to the very heart of the inquiries that plaintiffs made concerning the structural integrity and habitability of the underground house. The trial court's determination clearly is not against the manifest weight of the evidence.

*Id.* at 1175-76 (citations omitted).

In this case, Defendants cannot raise a viable defense that Plaintiffs were not sufficiently careful to discover the iron bacteria condition and water seepage on their own. As stated above, the property inspections Plaintiffs had performed did not reveal those defects. It is not beyond reason that an inspection of the basement would have failed to uncover that which Defendants sought to conceal – the presence of iron bacteria and water seepage. Indeed, though it had only been four months since the previous hydrojetting, Defendants had the drain tile system hydrojetted nine days before they listed the Property for sale, which was at a far shorter interval than Defendants' recent practice of hydrojetting every ten months. Furthermore, the flooring Defendants chose for the basement is an orangish rust color that is similar to the color of iron bacteria, and the similarity in colors masks

22

evidence of past iron bacteria seepage. Under the circumstances, and as in *Carter*, Defendants here cannot claim as a defense the fact that Plaintiffs' property inspections did not uncover the concealed defects. Those defects go to the heart of Plaintiffs' inquiries and concerns regarding the suitability of the Property.

## IV.   PLAINTIFFS' REMAINING COUNTS

Plaintiffs have asserted Count II (Common Law Fraud), Count III (Illinois Residential Real Property Disclosure Act), and Count IV (Breach of Contract) in the alternative. Because the Court has found in favor of Plaintiffs on Count I, the Court does not make determinations on Plaintiffs' alternative Counts.

## V.   ATTORNEY'S FEES

The parties' real estate contract provides: "In any action with respect to this Contract, the Parties are free to pursue any legal remedies at law or in equity and the prevailing party in litigation shall be entitled to collect reasonable attorney fees and costs from the non-prevailing party as ordered by a court of competent jurisdiction." (JX 1, Section 28.)[4] Plaintiffs have prevailed in this action, as the Court has found in Plaintiffs' favor on their primary claim for rescission (on the basis of fraud). Accordingly, per the contract, Plaintiffs are entitled to reasonable attorney's fees and costs. *See Erlenbush v. Largent*, 819 N.E.2d 1186, 1188 (Ill. App.

---

[4] Additionally, the Illinois Residential Real Property Disclosure Act provides: "A seller who knowingly violates or fails to perform any duty prescribed by any provision of this Act or who discloses any information on the Residential Real Property Disclosure Report that the seller knows to be false shall be liable in the amount of actual damages and court costs, and the court may award reasonable attorney's fees incurred by the prevailing party." 765 ILCS 77/55.

Ct. 2004) ("Though not an action on the contract, an action for fraud in the inducement [concerning a real estate contract] is an action 'with respect to' the contract. Plaintiff, the prevailing party, is contractually entitled to attorney fees."). Plaintiffs shall file a fee petition in accordance with Local Rule 54.3 forthwith.

## VI.  PUNITIVE DAMAGES

Plaintiffs request an award of punitive damages. In general, under Illinois law,[5] "punitive damages are meant to punish the wrongdoer and to deter that party, and others, from committing similar acts in the future." *McQueen v. Green*, 202 N.E.3d 268, 282 (Ill. 2022) (citation omitted). Punitive damages may be awarded when the defendant's tortious conduct "evinces a high degree of moral culpability, that is, when the tort is committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." *Slovinski v. Elliot*, 927 N.E.2d 1221, 1225 (Ill. 2010) (citation and internal quotations omitted). To determine whether punitive damages are appropriate, "the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant." *McQueen*, 202 N.E.3d at 282 (citations and internal quotations omitted). In an action involving fraud, "deceit alone cannot support a punitive damage award, but such an award is appropriate where the false representations

---

[5] As this Court is sitting in diversity and Plaintiffs' claims sound in Illinois law, the Court "look[s] to the law of Illinois to determine the appropriateness of punitive damages." *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 946 (7th Cir. 2002).

are wantonly and designedly made." *Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 511 (7th Cir. 1997) (citations and internal quotations omitted). Thus, "a plaintiff seeking to recover punitive damages on a fraud claim must show, in addition to simple fraud, gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice and willfulness." *Id.* (citations and internal quotations omitted).

In making a determination as to punitive damages, this Court keeps in mind that "punitive damages are not favored in Illinois and . . . an award of such damages is appropriate only in cases of intentional, outrageous misconduct." *Id.* (citations omitted). In that context, the Court finds that Defendants' conduct does not evince a sufficiently high degree of moral culpability to justify an award of punitive damages. Though Defendants engaged in deceit, there are no extraordinary or exceptional circumstances clearly showing malice and willfulness. Accordingly, Plaintiffs' request for punitive damages is denied. The Court is confident that Defendants will disclose the defects at issue here if they sell the Property after reacquiring it.

## **CONCLUSION**

For the foregoing reasons, the Court finds in favor of Plaintiffs on Count I of their Amended Complaint and concludes that Plaintiffs are entitled to rescission of the real estate contract between the parties. The Court does not reach Plaintiffs' alternative Counts II to IV. Per Plaintiffs' request, the parties are ordered to submit briefing addressing: (1) the appropriate amounts due to the parties upon rescission; (2) the requisite closing documents; (3) the appropriate amount (if any) of pre-judgment interest and all associated fees and/or costs; and (4) any other matters relevant to the effective execution of rescission. Plaintiffs are to file their brief addressing these topics by May 26, 2023, Defendants are to file a response by June 23, 2023, and Plaintiffs are to file a reply by July 7, 2023. As ordered above, Plaintiffs are to separately file a fee petition in accordance with Local Rule 54.3 by May 12, 2023.

**SO ORDERED.**                    **ENTERED:**


**DATE:    April 25, 2023    **                    _____

                                                   **HON. MARIA VALDEZ**
                                                   **United States Magistrate Judge**

26